# EXHIBIT A

Capriotti's Sandwich Shop :: About



HOME   LOCATIONS   MENU   CATERING   ABOUT   FRANCHISING   PRESS   CAREERS   CONTACT

 Like  41k 

**History**
**Mission & Values**
**Awards**

# CAPRIOTTI'S ORIGINAL TURKEY STORY



Lois Margolet grew up in Wilmington, Delaware, in a neighborhood known as Little Italy. Lois had a dream to open her own sandwich shop, but she knew she needed to have something unique because there was plenty of strong competition out there. Little Italy had at least seven sandwich shops within a three block radius. In 1976, Lois quit her full-time job, borrowed money and purchased a boarded-up building on North Union Street in Wilmington, where the original Capriotti's Sandwich Shop still stands. Lois, along with her brother Alan Margolet, decided to open a sandwich shop on the first floor, while she lived on the second floor. She and Alan would name the sandwich shop after their grandfather, Philip Capriotti, who loved to cook for them.

Their concept was to capture the hearts of "real turkey lovers," an idea that would separate Capriotti's Sandwich Shop from almost all of its competition. They wanted to roast whole fresh turkeys overnight, a concept that no other sandwich shop in the area offered. They began by cooking one turkey per night, but the demand grew to the point where they were cooking 10 to 12 turkeys per night. They served sandwiches made-to-order with fresh roasted pulled turkey, the best quality meats and cheeses, and fresh rolls and produce delivered daily.

 < Back   |   Next >

home | locations | menu | catering | about | franchising | press | careers | contact | facebook | twitter

Like    41694 likes. Sign Up to see what your friends like.

Capriottis Sandwich Shop | About



HOME   LOCATIONS   MENU   CATERING   ABOUT   FRANCHISING   PRESS   CAREERS   CONTACT

Like   41k 

**History**
**Mission & Values**
**Awards**

# CAPRIOTTI'S ORIGINAL TURKEY STORY



Success in the sandwich world wasn't easily gobbled up. It took a lot of years and a whole lot of turkeys before Capriotti's Sandwich Shop became a household name. Within time, their business boomed and many more Capriotti's Sandwich Shops were born. The success is attributed to exceptional quality, extraordinary service and the loyal, repeat customers who could be heard saying, "Capriotti's makes the best sandwich I've ever eaten!"

In 1987, Lois and Alan added a partner, their cousin Diane Rizzo, and together they opened their second and third stores in New Castle and Newark, Delaware. Thereafter, the signature sandwiches, such as the "Bobbie®" and other specialty sandwiches, were introduced. The formula was so successful that franchising was offered to family members. Later, due to such great demand, franchising was offered to others outside of the family. Today, Capriotti's Sandwich Shops located around the country are carrying on the tradition begun in Delaware over 30 years ago.

< Back   |   Next >

home | locations | menu | catering | about | franchising | press | careers | contact | facebook | twitter

Like    41694 likes. Sign Up to see what your friends like.

# EXHIBIT B

Int. Cls.: 35 and 43

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 3,530,393

Registered Nov. 11, 2008

## SERVICE MARK
## PRINCIPAL REGISTER

# Capriotti's Sandwich Shop

CAPRIOTTI'S SANDWICH SHOP, INC. (NEVADA CORPORATION)

400 N. STEPHANIE ST., STE. 235

HENDERSON, NV 89011

FOR: RETAIL DELICATESSEN SERVICES, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 12-31-1976; IN COMMERCE 12-31-1976.

FOR: RESTAURANT SERVICES FEATURING SANDWICHES; RESTAURANT SERVICES, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 12-31-1976; IN COMMERCE 12-31-1976.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 3,015,434.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SANDWICH SHOP", APART FROM THE MARK AS SHOWN.

SEC. 2(F).

SER. NO. 77-417,594, FILED 3-10-2008.

JENNIFER MARTIN, EXAMINING ATTORNEY

Int. Cls.: 35 and 43

Prior U.S. Cls.: 100, 101 and 102

**United States Patent and Trademark Office**

Reg. No. 3,571,960

Registered Feb. 10, 2009

## SERVICE MARK
### PRINCIPAL REGISTER



CAPRIOTTI'S SANDWICH SHOP, INC. (NEVADA CORPORATION)
400 N. STEPHANIE ST., STE. 235
HENDERSON, NV 89014

FOR: RETAIL DELICATESSEN SERVICES, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 6-1-2008; IN COMMERCE 6-1-2008.

FOR: DELICATESSENS; RESTAURANT SERVICES; RESTAURANT SERVICES FEATURING SANDWICHES, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 6-1-2008; IN COMMERCE 6-1-2008.

OWNER OF U.S. REG. NO. 3,015,434.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "EST. 1976" AND "SANDWICH SHOP", APART FROM THE MARK AS SHOWN.

THE COLOR(S) BLACK, WHITE, AND RED IS/ ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF WIDE, ELONGATED BLACK DIAMOND SHAPE IN BACKGROUND WITH A WHITE INTERIOR BORDER AND A BLACK EXTERIOR BORDER; A WIDE, ELONGATED WHITE OVAL SUPERIMPOSED OVER BLACK DIAMOND BACKGROUND WITH A RED BORDER AND BLACK WORDS NEAR TOP OF OVAL "- EST. 1976 -" AND STYLIZED, LARGE BLACK WORDS "CAPRIOTTI'S" OVER BREADTH OF OVAL; RED BANNER ACROSS BOTTOM PORTION OF DIAMOND BACKGROUND THAT MERGES WITH BOTTOM PORTION OF OVAL, WITH A WHITE INTERIOR BORDER THAT MERGES WITH WHITE BOTTOM PORTION OF OVAL, A BLACK EXTERIOR BORDER MEETING WITH THE RED BORDER OF THE OVAL SHAPE, AND WHITE CAPITALIZED WORDS "SANDWICH SHOP" ACROSS BREADTH OF BANNER.

SER. NO. 77-496,921, FILED 6-11-2008.

BENJAMIN OKEKE, EXAMINING ATTORNEY

Int. Cl.: 43

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 3,015,434

Registered Nov. 15, 2005

## SERVICE MARK
### PRINCIPAL REGISTER



AL-LOMAR, INC. (DELAWARE CORPORATION)
2206 WEST 3RD STREET
WILMINGTON, DE 19805

FOR: RETAIL DELICATESSEN AND RESTAU-
RANT SERVICES, IN CLASS 43 (U.S. CLS. 100 AND
101).

FIRST USE 12-19-1987; IN COMMERCE 12-19-1987.

THE MARK CONSISTS OF A RHOMBUS WITH A
BORDER AND A CHECKERED INTERIOR; SUPER-

IMPOSED THEREON AND EXCEEDING THE BOR-
DER IS AN IMAGE OF A TURKEY IN A SIDE VIEW;
SUPERIMPOSED ON THE TURKEY IS A RACE-
TRACK-SHAPED OVAL; AND SUPERIMPOSED ON
THE OVAL IS THE WORD "CAPRIOTTI'S" IN
STYLIZED AND ITALICIZED TYPE.

SER. NO. 78-478,290, FILED 9-2-2004.

JACQUELINE A. LAVINE, EXAMINING ATTOR-
NEY

Int. Cl.: 30

Prior U.S. Cl.: 46

**Reg. No. 2,273,912**

## United States Patent and Trademark Office

Registered Aug. 31, 1999

### TRADEMARK
### PRINCIPAL REGISTER

# The Bobbie

AL-LOMAR, INC. (DELAWARE CORPORA-
TION)
510 NORTH UNION STREET
WILMINGTON, DE 19805

FOR: SANDWICH ON A SUBMARINE STYLE
ROLL, MADE WITH ROAST TURKEY, CRAN-
BERRY SAUCE, STUFFING, AND MAYON-
AISE, IN CLASS 30 (U.S. CL. 46).
    FIRST USE 2–15–1998; IN COMMERCE
2–15–1998.

SER. NO. 75–452,818, FILED 3–19–1998.

LAURIE MINTZER, EXAMINING ATTORNEY

Int. Cl.: 30

Prior U.S. Cl.: 46

**United States Patent and Trademark Office**

Reg. No. 3,622,413

Registered May 19, 2009

## TRADEMARK
### PRINCIPAL REGISTER

# The "Bobbie"

CAPRIOTTI'S SANDWICH SHOP, INC. (NEVADA CORPORATION)

400 N. STEPHANIE ST., STE. 235

HENDERSON, NV 89014

FOR: SANDWICHES, NAMELY, ON A SUBMARINE STYLE ROLL, MADE WITH ROAST TURKEY, CRANBERRY SAUCE, STUFFING, AND MAYONNAISE, IN CLASS 30 (U.S. CL. 46).

FIRST USE 2-15-1998; IN COMMERCE 2-15-1998.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 2,273,912.

SEC. 2(F).

SER. NO. 77-584,043, FILED 10-2-2008.

SONYA STEPHENS, EXAMINING ATTORNEY

# EXHIBIT C



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Jan 17 04:35:45 EST 2012*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At:          OR  Jump  to record:        **Record 1 out of 8**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | CAPRIOTTI'S |
| **Goods and Services** | IC 043. US 100 101. G & S: retail delicatessen and restaurant services. FIRST USE: 19871219. FIRST USE IN COMMERCE: 19871219 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 03.15.05 - Turkeys<br>25.03.01 - Checker board pattern; Checkerboard patterns<br>26.07.01 - Diamonds with plain multiple line border; Diamonds with plain single line border |
| **Serial Number** | 78478290 |
| **Filing Date** | September 2, 2004 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | August 23, 2005 |
| **Registration Number** | 3015434 |
| **Registration** | |

| Date | November 15, 2005 |
|---|---|
| Owner | (REGISTRANT) AL-LOMAR, iNC. CORPORATION DELAWARE 2206 West 3rd Street Wilmington DELAWARE 19805 |
| | (LAST LISTED OWNER) CAPRIOTTI'S SANDWICH SHOP, INC. CORPORATION NEVADA 400 N. STEPHANIE ST., STE. 235 HENDERSON NEVADA 89014 |
| Assignment Recorded | ASSIGNMENT RECORDED |
| Attorney of Record | David Staats |
| Description of Mark | The mark consists of a rhombus with a border and a checkered interior; superimposed thereon and exceeding the border is an image of a turkey in a side view; superimposed on the turkey is a racetrack-shaped oval; and superimposed on the oval is the word "Capriotti's" in stylized and italicized type. |
| Type of Mark | SERVICE MARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST

NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY



# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue Jan 17 04:35:45 EST 2012*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST

NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At:        OR  Jump | to record:        **Record 3 out of 4**

TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# The Bobbie

| | |
|---|---|
| **Word Mark** | **THE BOBBIE** |
| **Goods and Services** | IC 030. US 046. G & S: sandwich on a submarine style roll, made with roast turkey, cranberry sauce, stuffing, and mayonaise. FIRST USE: 19980215. FIRST USE IN COMMERCE: 19980215 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 75452818 |
| **Filing Date** | March 19, 1998 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | June 8, 1999 |
| **Registration Number** | 2273912 |
| **Registration Date** | August 31, 1999 |
| **Owner** | (REGISTRANT) AL-LOMAR, INC. CORPORATION DELAWARE 510 North Union Street Wilmington DELAWARE 19805 |

(LAST LISTED OWNER) CAPRIOTTI'S SANDWICH SHOP, INC. CORPORATION NEVADA 400 N. STEPHANIE ST., STE. 235 HENDERSON NEVADA 89014

| | |
|---|---|
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Ritchie W. Taylor |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20090930. |
| **Renewal** | 1ST RENEWAL 20090930 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST

NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT D

*FT. Apache*

# FRANCHISE AGREEMENT

### by and between

### AL-LOMAR, INC.

### and

### TAYLOR FAMILY HOLDINGS, INC., DBA CAPRIOTTI'S

### for a

### CAPRIOTTI'S SANDWICH SHOP

**providing for the retail sale of**
**various submarine and deli sandwiches and related items**



## TABLE OF CONTENTS

**Page**

FRANCHISE AGREEMENT ................................................................................................ 1

| | | |
|---|---|---|
| 1. | Grant of Franchise | 1 |
| 2. | Term | 2 |
| 3. | Location and Territory | 2 |
| 4. | Franchise Fee and Royalties | 3 |
| 5. | Trademarks, Trade Names, and Trade Secrets | 3 |
| 6. | Restrictive Covenant | 5 |
| 7. | Obligations of Franchisor | 5 |
| 8. | Obligations of Franchisee | 6 |
| 9. | Examination of Financial and Business Records | 7 |
| 10. | Termination | 8 |
| 11. | Right Upon Termination | 8 |
| 12. | Right of First Refusal | 8 |
| 13. | Closing on Right of First Refusal | 9 |
| 14. | Bankruptcy and Other Involuntary Transfers | 9 |
| 15. | Transfers to Franchisee's Family | 10 |
| 16. | Transfer Upon Death | 10 |
| 17. | Determination of Fair Market Value | 10 |

MISCELLANEOUS TERMS AND CONDITIONS ........................................................... 10

| | | |
|---|---|---|
| 18. | Franchise Information | 10 |
| 19. | Damages for Breach | 11 |
| 20. | Assignment/Entire Agreement | 11 |
| 21. | Severability | 11 |
| 22. | Governing Law | 11 |
| 23. | Survival | 11 |
| 24. | Legal Counsel | 11 |
| 25. | Cooperation | 11 |
| 26. | Effect of Waiver | 11 |
| 27. | Arbitration of Disputes | 12 |
| 28. | Limitations on Recovery | 12 |
| 29. | Indemnification | 12 |
| 30. | Notices | 13 |

Exhibits

A   Description of Area or Radius Within Which Al-Lomar Shall Not Use Nor Allow
     Anyone Else To Use Its Trademarks, Service Marks, Trade Secrets or Tradename
B   Financial Statement For Period
C   Restrictive Covenant As To Franchisee
D   Restrictive Covenant As To Shareholders of Franchisee
E   Employment Agreement
F   Collateral Assignment of Lease
G   Landlord's Consent to Collateral Assignment of Lease
H   Franchise Information Sheet

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (this "Agreement") made this _17th_ day of _March_, 2003 by and between Al-Lomar, Inc., a Delaware corporation, having its principal office located at 510 North Union Street, Wilmington, Delaware, hereinafter referred to as "Al-Lomar" or "Franchisor," and (Prospective Franchisee), a Nevada corporation, having its registered office at 4560 S. Decatur Blvd, Suite 202, Las Vegas, NV 89103, hereinafter referred to as "Franchisee".

**WHEREAS,** Franchisor is the owner of the trademarks, service mark, trade secrets, and logo "Capriotti's" (the "Marks"), as well as the trade name "Capriotti's," (the "Name") and trade secrets and know-how for use in connection with the unique process and system for the preparation and sale of all of its food products (the "Al-Lomar System"), together with all of the goodwill connected therewith; and

**WHEREAS,** Franchisee hereby acknowledges the requirement of appropriate safeguards for the maintenance and future promotion of the Al-Lomar System by reason of its high standards of quality and service, and the fact that Franchisor has created over a period of years a superior reputation, name, identification, and consumer demand for its products; and

**WHEREAS,** Franchisee hereby acknowledges and agrees to the exclusive right of Franchisor in and to the Al-Lomar System as it is presently developed, or as the same may be improved upon during the term if this Agreement, including, trade secrets, designs, trademarks, trade names, logos, signs, and slogans presently in use and/or developed after the date of this Agreement, all of which may be used by Franchisee pursuant to the terms of this Agreement; and

**WHEREAS,** Franchisee desires, upon the terms and conditions of this Agreement, to obtain and enter into the business of operating a store utilizing the Al-Lomar System at and from the location agreed upon in this Agreement, under the name "Capriotti's," subject to the training and supervision of Franchisor, and in accordance with the standards of Franchisor presently in existence and/or as changed or modified at any time after the date of this Agreement.

**NOW, THEREFORE, IN CONSIDERATION OF** the foregoing, the mutual agreements herein contained, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties, the parties hereby agree as follows:

## FRANCHISE AGREEMENT

1.    **Grant of Franchise**. Franchisor hereby grants Franchisee during the term of this Agreement a non-assignable right to use the Marks and the Name as designated and authorized by Franchisor, and the Al-Lomar System, in the operation of a sandwich and specialty shop (hereinafter referred to as the "Store" or the "Franchised Business"). The Franchised Business shall be limited to one unit, the designated location being specifically set forth in Paragraph 3 of this Agreement. Franchisee is hereby also granted the right to use the system of operation and

method of doing business conceived and designated by Franchisor, and to buy supplies and products and to sell those items and products specified by Franchisor according to the procedures, system, and methods defined in this Agreement and the Confidential Al-Lomar Policies and Procedures Manual (the "Manual").

2. **Term.** If, under local law, this Agreement must be registered with a governmental authority, it will not become effective until it is registered. This Agreement shall be effective for a period of ten (10) years from the date of this Agreement (the "Initial Term"). If, upon the expiration of the Initial Term of the Agreement, the Franchisee has fully complied with all of the terms and conditions of this Franchise Agreement, the Franchisee shall have an option to renew this Agreement for an additional ten (10) year term under the same terms and conditions of this Agreement provided that:

(a) The royalties payable by the Franchisee under this Agreement may be increased by Franchisor, in its sole discretion, but not to exceed, in any event, ten percent (10%) of the gross sales of the Franchisee; and

(b) Franchisee provides notice of the intent to renew to the Franchisor at least ninety (90) days prior to the expiration of the Initial Term. The notice so required shall be sent by certified mail, return-receipt requested, to the principal place of business of Al-Lomar, Inc. as indicated herein or as may be changed in the future; and

(c) Franchisee shall execute Al-Lomar's then-current form of franchise agreement which agreement shall replace and supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including, a higher percentage royalty fee; and

(d) Franchisee shall pay a renewal fee of Five Thousand Dollars ($5,000.00).

3. **Location and Territory.**

(a) The street address of the location of the Store approved by this Agreement is 4835 Ft. Apache, Suite K, Las Vegas, NV 89147 (the "Approved Location" or "Protected Territory"). The Franchisee shall operate the Store under the terms of this Agreement at the Approved Location and at no other location without prior written consent of Franchisor.

(b) Without prior written consent of the Franchisee, Franchisor shall neither itself use nor shall it allow anyone else to use the Marks or the Name within that certain area or radius, as more fully described on **Exhibit "A"** attached hereto (as modified and defined hereinafter), around the Approved Location so long as this Agreement or any renewal thereof remains in full force and effect.

2

(c)     Without prior written consent of the Franchisor, Franchisee shall neither itself nor shall it allow anyone else to make food deliveries from the Store located at the Approved Location.

4.     **Franchise Fee and Royalties**.  In consideration of the rights granted herein, Franchisee shall pay to Franchisor the following:

(a)     A one time nonrefundable franchisee fee of Fifty Thousand Dollars ($50,000.00) (the "Initial Franchise Fee") to be paid simultaneously with the execution of this Franchise Agreement.

(b)     A royalty in a sum equal to six percent (6%) of Franchisee's total gross sales.  The payment shall be due on the tenth (10th) day after the end of each month following the opening of the Store.  Along with the royalty check calculated in accordance with this Section 4, Franchisee shall send to Franchisor, in the form approved by Franchisor attached hereto as **Exhibit "B"**, a gross monthly sales statement showing all sales and receipts of money during the prior month, accompanied by cash register tapes showing daily totals, and, in the event of credit card sales, copies of daily batch reports.

For purposes of this payment, "Gross Sales" shall mean the total of all sales and/or fees charged and received by Franchisee for products and/or services rendered, or upon orders placed at, or completed by delivery in, through or from the Store.

(c)     Franchisee agrees to furnish Franchisor with monthly financial statements in the form attached hereto as **Exhibit "B"** by the 25th of each month.

(d)     Franchisee agrees to furnish Franchisor with yearly tax returns for the Franchised Business the earlier of than (i) the 25th of April, or (ii) thirty (30) days after the filing of said return with the applicable state and federal tax authorities .

5.     **Trademarks, Trade Names, and Trade Secrets**.  Franchisee acknowledges that it is required, to the extent possible, to prevent those persons or parties associated with or employed by it from the unauthorized use of Franchisor's Marks and Name); and also to maintain and control the quality of products sold through the use of those Marks and Name.

Franchisee therefore covenants and agrees to perform and abide by the following provisions:

(a)     Franchisee shall not use the Marks or Name or any stylistic or colorable variation thereof as (i) part of a trademark, service mark or trade name of any corporation, partnership, proprietorship, or other business entity in which Franchisee owns or holds any interest, or as (ii) the trademark, trade name, or assumed name of any business entity except in connection with the terms of this Agreement and the Franchised Business.

3

(b)    Franchisee shall not use any of the Marks or Name in connection with any advertising, promotion, sale, or distribution of any item or other product not included on Franchisor's approved list or for any service not offered by Franchisor without Franchisor's prior written consent.

(c)    Franchisee shall not use or allow the use of Franchisor's registered Marks or Name in or on any promotional material, advertisement, display, business forms, or other printed material without affixing the Marks or Name to such material in the manner required by Franchisor.  All advertising and promotion must conform to the standards and requirements specified by Al-Lomar.  Franchisee must submit to Al-Lomar (through the mail, return receipt requested) for prior written approval, samples of all advertising and promotional plans and materials to be used by Franchisee in the Franchised Business.

(d)    Franchisee shall use the Marks and Name in the precise form prescribed by Franchisor and shall observe all directions from Franchisor regarding the presentation of the Marks and Name and the manner of their display and use. All paper goods, advertising, and promotional material that has not been furnished by Franchisor shall be submitted by Franchisee to Franchisor for approval prior to use by Franchisee in the Franchised Business.  Franchisor's approval shall not be unreasonably withheld or delayed for more than five (5) business days after receipt of the proposed advertising material.

(e)    Franchisee shall use the Marks or Name only on any goods and/or for any services which are in compliance with the directions and specifications issued by Franchisor from time to time and with such other quality control measures now in effect or which Franchisor may adopt in the future to promote and defend the goodwill associated with the Marks and Name.  Franchisee is prohibited from using the Marks or Name on any goods and/or for any services not in compliance with such directions and specifications issued by Franchisor.

(f)    Franchisee shall promptly discontinue use of the trade marks, trade secrets, service marks, and trade name of Franchisor, and shall take appropriate action to remove said Marks and Name from the premises upon which its business is located upon the expiration, termination, or revocation of this Agreement.

(g)    Franchisee and its shareholders, partners or members, as the case may be, recognize and acknowledge the extraordinary value of the unique trade secrets developed by Franchisor and as utilized in its sandwich shop business, as well as those of its Franchisees. Franchisee and its shareholders promise to maintain absolute confidentiality as to the entire Al-Lomar System during the term of its franchise and after its termination or expiration, including, the purchase of supplies and products, and method of preparation of the product, and the presentation of the same.  Neither during the Initial Term, any renewal terms, nor after the termination or expiration of this Agreement, shall Franchisee and its shareholders disclose any part of the Al-Lomar System to any third person or entity who is not directly associated with the operation of the Franchise granted by this Agreement and whose position as employee or the like makes it necessary to have knowledge of the Al-Lomar System.

4

(h)   Franchisee and its shareholders agree that, in the event any trade secrets are disclosed in violation of this Agreement, then, Franchisee and its shareholders shall be liable for damages with respect to loss of potential franchise fees, loss of royalties, attorneys' fees related to the breach of its promise, costs, and any other damages or remedies deemed appropriate by a court of competent jurisdiction.

6.   **Restrictive Covenant**.  Upon the expiration, termination, or revocation of this Agreement for any reason, neither Franchisee nor any of its shareholders, officers, directors, general or limited partners or members, as the case may be, either directly or indirectly, shall engage in any business competitive with the business of Franchisor for a period of three (3) years within a three hundred (300) mile radius of the Store. In this regard, Franchisee shall execute the Restrictive Covenant attached hereto as **Exhibit "C"**. Franchisee shall, furthermore, require all present and future shareholders, members or partners, as the case may be, to execute the Restrictive Covenant attached hereto as **Exhibit "D"** prior to or simultaneously with the issuance of the stock to that party.

7.   **Obligations of Franchisor**. Franchisor agrees:

(a)   to make available to Franchisee the benefit of its knowledge and experience in the installation, commencement, and operation of the Al-Lomar System for the Franchised Business;

(b)   to make available to the Franchisee Business the benefit of its knowledge and experience in: (i) selection and installation of equipment and furnishings; (ii) appropriate décor and store layout; (iii) purchase, location, and installation of signs identified with the operation of the franchise; and (iv) the Al-Lomar System;

(c)   to render advisory service regarding the operation of the Franchised Business, including, handling products and services in accordance with the Al-Lomar System and development of personnel policy and training of the Store's employees in the operation of the business;

(d)   to assist Franchisee in promoting the Franchised Business through advertising and public relations as Franchisor solely deems appropriate;

(e)   to provide quality control by conducting random, unannounced inspections of the Store to ensure quality of products and services;

(f)   to provide on loan a copy of the Manual;

(g)   at the reasonable request of Franchisee, and in Franchisor's sole discretion, provide training to the Franchisee and to employees of the Store prior to the opening of the Store;

5

(h)     at the reasonable request of the Franchisee, to assist in the set-up of the accounting system to be utilized by the Store;

(i)     to review monthly reports, and other information of the Franchised Business as may be required by Franchisor; and

(j)     to provide to Franchisee, price lists for all products in the Store .

All obligations of Al-Lomar under this Agreement are to Franchisee, and no other party is entitled to rely on, enforce, or obtain relief for breach of such obligations, either directly or by subrogation.

If Franchisee fails to pay any sum due Al-Lomar on such date payment is due, or is otherwise in default under any agreement between Franchisee and Al-Lomar, Al-Lomar may, at its sole discretion, withhold any supervisory assistance, or other services listed in this Section 7.

8.    **Obligations of Franchisee**.  Franchisee agrees:

(a)     to specifically follow the requirements and procedures set forth by the Al-Lomar System presently in effect and as may be amended from time to time in the sole discretion of the Franchisor;

(b)     to allow Franchisor the right to approve a manger with full managerial powers and authority to control the daily operations of the Franchisee's business during the first six (6) months of operation.  Although Franchisor shall have the right to approve a manger, the manager shall be subject to the control of the Franchisee.  Franchisee understands that intent of Franchisor is to insure an appropriate initial set-up and, as importantly, to institute proper and adequate general business practices, product preparations, service by employees, purchase of supplies, and whatever other standards or procedures would be appropriate in order to facilitate and assist in the effective operation of the franchise;

(c)     to employ the methods of operation specified by Franchisor, the Manual and the Al-Lomar System in order to insure the highest quality food products and services to the consuming public.  Franchisee understands there must be strict adherence, without variation, to the aforesaid method of preparation and presentation of the products sold by Franchisee and to all other requisites and directions set forth by the Al-Lomar System now in effect and as modified by Franchisor from time to time;

(d)     to comply with all requests of Franchisor with respect to the appearance and use of the Marks and Name licensed under this Agreement, including any requests to change the form or style or discontinue using any of said Marks and Names.

6

(e)  to, prior to opening the Store, take such measures as are necessary to obtain all appropriate licenses, permits, and approvals to do business at the Approved Location and shall present evidence of the same to Franchisor upon obtaining such documents;

(f)  to first obtain the approval of the Franchisor with regard to the form, contents, and nature of any advertising it intends to use in connection with the operation of the Franchised Business;

(g)  to, prior to opening the Store, obtain liability insurance relating to the premises, business operations, and product liability with minimum policy limits of at least One Million Dollars ($1,000,000.00) and with a specific minimum medical payment per person of Five Thousand Dollars ($5,000.00). Franchisee shall, furthermore, obtain appropriate workman's compensation insurance. In the event Franchisor deems it appropriate to increase the minimum limits or coverage of the policies of insurance outlined above, it shall have the right to do so at its sole discretion. Upon notice from Franchisor to Franchisee, Franchisee shall take immediate measures to obtain such policies as are required by this provision. Franchisee shall provide Franchisor with written evidence of the insurance policies required by this Agreement within five (5) days of obtaining the policies;

(h)  to require all employees to execute the Employment Agreement attached hereto as **Exhibit "E"** prior to the hiring of said employees; and

(i)  Franchisee shall enter into a Collateral Assignment of Lease with Franchisor upon entering into a lease with the landlord in the form attached hereto as **Exhibit "F"**. This Collateral Assignment of Lease shall provide for an assignment of the lease, at Al-Lomar's sole discretion, to Al-Lomar in the event of Franchisee's default under its lease with its landlord. Franchisee shall provide to Al-Lomar an originally signed Consent of the Landlord to the Collateral Assignment Lease in the form attached hereto as **Exhibit "G"** (the "Landlord's Consent").

Franchisee shall provide Franchisor with copies of the executed lease and any amendments thereto relating to the lease for the duration of the term of the Agreement.

9.  **Examination of Financial and Business Records**. Franchisor shall have the right, upon twenty four (24) hours notice, to examine all financial and business records of the Franchisee, including, but not limited to, invoices, deposits, withdrawals, bank statements, proofs of purchases and sales, cash register tapes, and any other documents, data, and/or records relating to the financial affairs or business operations of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books of the Franchised Business. If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount understated upon demand, in addition to interest on such amount from the date such amount was due until paid, at the rate which is two percent (2%) above the Prime Rate published in the Wall Street Journal on the date payment was due, or the maximum rate permitted by law, whichever is less, calculated on a daily

7

basis. If an inspection discloses an understatement in any payment of three percent (3%) or more, Franchisee shall, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, travel, lodging and wage expenses and reasonable accounting and legal costs). Franchisor has the right to terminate the Franchise Agreement upon discovery of two (2) such discrepancies in a single calendar year. If an inspection discloses an understatement in any payment of ten percent (10%) or more, it shall constitute grounds for immediate termination of this Agreement, as set forth in Section 10 hereof. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

10.   **Termination**.  Franchisor, in its sole discretion, may terminate this Agreement and all of the rights of Franchisee under this Agreement upon the occurrence of any of the following events which Franchisee shall fail to remedy after notice.

If the Franchisee shall (a) become in default under any real estate lease relating to the Store or any lease relating to equipment leased by the Franchisee in connection with the Franchised Business, and such default remains unremedied for thirty (30) days following Franchisee's receipt of written notice thereof; (b) close the business operation for a period of fifteen (15) days without Franchisor's prior written consent; (c) default in the performance of any of the covenants, terms, or conditions of this Agreement, and such default is not cured within five (5) days following Franchisee's receipt from Franchisor of written notice at its principal place of business, either by hand or certified mail, return-receipt requested, of such default; (d) become insolvent, is adjudicated as bankrupt, has a voluntary or an involuntary petition filed in bankruptcy, or any other arrangement under bankruptcy or insolvency laws, makes an assignment for the benefit of creditors, or if a receiver or trustee in bankruptcy is appointed to take charge of Franchisee's affairs or property; or (e) permits any judgment against it (which is not stayed pending appeal) to remain unsatisfied for fifteen (15) days.

11.   **Rights Upon Termination**.  Franchisee understands and agrees that, in the event of a termination of this Agreement pursuant to Paragraph 10 herein, Franchisee shall not be entitled to any refund of the Initial Franchise Fee.

12.   **Right of First Refusal**.  At least sixty (60) days prior to a proposed sale or transfer by Franchisee or any other party holding fifty percent (50%) or more of the ownership interest in the Franchisee, such ownership interest including, but not limited to, stock, partnership interest, or limited liability company membership interest ("Ownership Interest"), or fifty percent (50%) or more of its assets (the "Sale Assets") (the Ownership Interest and the Sale Assets collectively, the "Offered Property"), whether voluntarily or involuntarily undertaken, Franchisee shall give written notice of such proposed sale or transfer to Franchisor. Said notice must set forth the name of the proposed purchaser, a description of the Offered Property, all terms and conditions of the proposed sale or transfer, and must be accompanied by such information which Franchisor may request, including a fully executed Purchase and Sale Agreement the effectiveness of such Purchase and Sale Agreement being contingent upon Franchisor's waiver of its right of first refusal as described in this section (the "Transfer Packet"). Upon Franchisor's receipt of the notice and Transfer Packet, the sixty (60) day notice period shall

8

commence (the "Notice Period"). Franchisor shall have the option and right, within the Notice Period, to notify Franchisee of the intent of Franchisor to purchase the Offered Property from the Franchisee on the same terms and conditions set forth in the Transfer Packet. In the alternative, within the Notice Period, Franchisor may notify Franchisee that Franchisor has elected to withhold approval of the proposed transfer of the Offered Property by providing the specific reasons for such action. Franchisor may not unreasonably withhold such approval. Franchisor may withhold approval in the event (a) the proposed transferee does not agree to be bound by the terms and conditions of this Agreement or the then current Franchise Agreement for the balance of Franchisee's term, or (b) if the proposed transferee is otherwise unacceptable as a franchisee in the Franchisor's sole discretion. If Franchisor shall fail to respond to Franchisee's notice of intent to transfer the Offered Property within the Notice Period by approving or disapproving the proposed transfer or by electing to purchase according to the terms and conditions offered to the proposed transferee, Franchisee may then transfer the Offered Property in accordance with the terms of said notice. Upon consummation of such transfer to the proposed transferee, Franchisee shall pay to Franchisor a transfer fee of one percent (1%) of the sale price received by the Franchisee.

13.   **Closing on Right of First Refusal**. If Franchisor elects to purchase the Offered Property, the closing shall take place on the earlier of (i) the date stated in the notification by Franchisor of the intent to purchase the Offered Property or (ii) ninety (90) days following commencement of the Notice Period. Franchisee shall not sell the Offered Property on any terms and conditions fundamentally different from those contained in the notice without first having given corrected notice thereof to Franchisor, in which case Franchisor shall have all of the rights granted to it under Section 12 above as to such corrected or changed terms and conditions.

14.   **Bankruptcy and Other Involuntary Transfers**. The right of first refusal granted, pursuant to Sections 12 and 13 of this Agreement, shall furthermore apply in the following instances where:

(a)   Franchisee files a voluntary petition in bankruptcy or any other petition for relief under any section of the bankruptcy or insolvency laws of the United States or any state therein now in force or hereinafter enacted;

(b)   Franchisee makes an assignment of the benefit of creditors;

(c)   Franchisee is adjudged bankrupt;

(d)   a receiver or trustee is appointed for Franchisee by any court;

(e)   the interest of the Franchisee in any equipment or inventory shall be sold under any execution or other process issued out of any court;

9

(f)     Franchisee shall abandon, vacate without just cause, or be evicted from the business premises by court order or justifiable action of a landlord during the term of this Agreement.

15.     **Transfers to Franchisee's Family**.  Notwithstanding the right of first refusal granted to Franchisor pursuant to Sections 12 and 13 of this Agreement, Franchisee, or any stockholder, member or partner of Franchisee, as the case may be, may transfer any interest in the Franchised Business to Immediate Family (as defined below), by gift or Last Will and Testament.  Likewise, Franchisor shall not have the option to first purchase any interest in the Franchisee which is transferred to Immediate Family as a result of a shareholder's, partner's or member's, as the case may be, death.  For purposes of this Agreement, the term Immediate Family shall mean the children or stepchildren of the stockholders, partners, or members, as the case may be, of Franchisee.

16.     **Transfer Upon Death**.  Upon the death of any stockholder, member or partner of Franchisee, and their Immediate Family, the Franchisor shall have the option to first purchase all of the shares of stock owned by the decedent at the time of his or her death pursuant to the terms and conditions of this Agreement.  Franchisor shall have one (1) year from the date of death within which to purchase the shares of stock owned by any decedent not a member of the Immediate Family of Franchisee.

17.     **Determination of Fair Market Value**.  For the purpose of exercising the various rights to purchase described in Paragraphs 12 through 16 of this Agreement, the fair market value of the interest in Franchisee shall be mutually determined by the corporate accountant for Franchisor and the corporate accountant for Franchisee.  In the event of a disagreement, the aforesaid accountants shall appoint an independent accountant that has not provided services to either Franchisee or Franchisor for three years prior to such appointment whose determination shall be binding.  In the further event that within thirty (30) days after attempting to choose an independent accountant, the two parties' accountants are unable to agree on a third independent accountant, then the firm of Price Waterhouse Coopers shall evaluate the fair market value of the interest in the Franchisee and its determination shall be binding.

## MISCELLANEOUS TERMS AND CONDITIONS

18.     **Franchise Information**.  Franchisee shall furnish to Franchisor the names, addresses, and telephone numbers of all shareholders members, partners, executive officers, members of the Board of Directors, and managers, as the case may be, in the form attached hereto as **Exhibit "H"** prior to opening of store.  In the event that Franchisee is an entity formed under state or federal law, prior to or simultaneous with the date of execution of this Franchise Agreement, Franchisee shall provide Franchisor with appropriate Minutes and/or Resolutions of the Franchisee setting forth authority of the Franchisee to enter into this Franchise Agreement and the acceptance of all of the terms and conditions herein set forth.

10

19.  **Damages for Breach**. In the event Franchisee breaches any of the obligations set forth herein or permits any default to continue after due notice, it shall be liable for all damages resulting therefrom, as well as Franchisor's attorney's fees, costs of litigation, and any other damages or remedies determined as appropriate by a court of competent jurisdiction. These damages are to be deemed cumulative and in addition to any other rights or remedies to which Franchisor may be entitled.

20.  **Assignment/Entire Agreement**.  Franchisor may assign its rights and/or obligations set forth in this Agreement without consent of Franchisee. All covenants and agreements under this Agreement shall inure to the benefit of and be enforceable by Franchisor's successors and assigns. This Agreement shall supersede all prior agreements, representations, warranties, and understandings between the parties hereto. Any modification or waiver of any other of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality as this Agreement. Except as otherwise provided in this Agreement, Franchisee may not sell, assign, transfer, convey, gift, pledge, mortgage, encumber, or hypothecate the rights and/or obligations set forth in this Agreement without the prior written consent of Franchisor.

21.  **Severability**. In the event any one or more of the paragraphs or clauses contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not effect any other provision thereof, and this Agreement shall be construed as though such invalid, illegal, or unenforceable provision had never been contained herein, and there shall be deemed substituted such other provision as will most nearly accomplish the intent of the parties to the extent permitted by applicable law.

22.  **Governing Law**. This Agreement is a Delaware contract and is to be interpreted and construed in accordance with the laws of the State of Delaware.

23.  **Survival**. This Agreement shall survive the death of the parties and the death of the heirs, executors, and/or assigns, personal representatives, and successors-in-interests of the parties.

24.  **Legal Counsel**. Each party hereto acknowledges that it has either received independent legal advice prior to signing this Agreement or has been advised of its rights to have the same and has elected not to retain an attorney. Each of the parties further declares that it has signed this Agreement freely and voluntarily.

25.  **Cooperation**. The parties hereto agree to execute any and all documents, papers, or other writings that are necessary to give full force and effect to this Agreement.

26.  **Effect of Waiver**. The failure of either party to insist upon strict performance of any other provisions of this Agreement shall not be construed as a waiver of any subsequent default of the same or similar nature.

11

27.   **Arbitration of Disputes**.  Franchisor and Franchisee shall arbitrate any disputes arising under this Agreement in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in effect at a hearing administered by the AAA to be held in Wilmington, Delaware, or such other location in the State of Delaware designated by the AAA.  Any court having jurisdiction may enter judgment on the Arbitrator's award.  Notwithstanding anything to the contrary in this Section 27, if Franchisee breaches the provisions of this Agreement that prohibit Franchisee from infringing upon the intellectual property rights of the Franchisor or disclose confidential information of the Franchisor or breach any agreement Franchisee has with the Franchisor not to compete with the business of the Franchisor, Franchisee may cause irreparable harm to Franchisor and the Al-Lomar System as a whole.  In such event, Franchisor may bring an action in any court having jurisdiction in connection with any such breach and may seek damages, injunctive relief, or both.  If a court of competent jurisdiction decides that this arbitration clause is unenforceable and after any and all final appeals the decision is upheld, the parties agree to litigate any dispute arising under this Agreement or any breach of this Agreement in the State of Delaware.  The parties waive any right to trial by jury, except where waiver is prohibited by applicable federal or state law.

28.   **Limitations on Recovery**.  Franchisee agrees that the only person or entity from which it may seek damages or any remedy for any dispute arising under this Agreement, including the breach of this Agreement, is the Franchisor, its successors or assigns.  Franchisee agrees that it will not name the Franchisor's shareholders, directors, officers, employees, or agents in any arbitration or legal action.  Franchisor acknowledges that it has relied on Franchisee's agreement to the provisions of this Section 28 in signing this Agreement.

29.   **Indemnification**.  As used in this Section, the phrase "Losses and Expenses" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, lost profits, attorneys' fees, accountants' fees, expert witness fees, expenses, court costs, settlement amounts, judgments, compensation for damages to Al-Lomar's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

a.   Franchisee shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Al-Lomar, its corporate affiliates, successors and assigns and the respective directors, officers, employees, agents and representatives of each (collectively, the "Indemnitees") from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

1.   Franchisee's violation, breach or asserted violation or breach of any contract, federal state or local law, regulation, rule, order, standard, or directive or of any industry standard;

12

2. Libel, slander or any other form of defamation by Franchisee;

3. Franchisee's violation or breach of any warranty, representation, agreement or obligation in this Agreement;

4. Acts, errors or omissions of Franchisee or any of its agents, servants, employees, contractors, partners, affiliates or representatives.

b. Franchisee shall promptly notify Al-Lomar of any action, suit, proceeding, claim, demand, inquiry or investigation as described in Section 29(a). If Al-Lomar is or may be named as a party in any such action, Al-Lomar may elect (but under no circumstances will be obligated) to undertake the defense and/or settlement thereof. No such undertaking by Al-Lomar shall, in any manner or form, diminish Franchisee's obligation to indemnify Al-Lomar and to hold it harmless.

c. With respect to any action, suit, proceeding, claim, demand, inquiry or investigation, Al-Lomar may, at any time and without notice, in order to protect persons or property or the reputation or goodwill of Al-Lomar or others, order, consent or agree to any settlement or take any remedial or corrective action as Al-Lomar deems expedient, if, in Al-Lomar's sole judgment, there are reasonable grounds to believe that:

1. any of the acts or circumstances enumerated in Section 29(a) have occurred; or

2. any act, error, or omission of Franchisee may result directly in or indirectly in damage, injury or harm to any person or any property.

d. All losses and expenses incurred under this Section 29(b), shall be chargeable to and paid by Franchisee pursuant to its obligations of indemnity hereunder, regardless of any actions, activity, or defense undertaken by Al-Lomar or the subsequent success or failure of such actions, activity or defense.

e. Under no circumstances shall the Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee. Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by the Indemnitees from Franchisee.

f. The Indemnitees assume no liability whatsoever for any acts, errors, or omissions of any persons with whom Franchisee may contract, regardless of the purpose. Franchisee shall hold harmless and indemnify the Indemnitees and each of them for all losses and expenses that may arise out of any acts, errors or omissions of such third parties with whom Franchisee may contract.

30. **Notices.** The parties hereto will give any notice required under this Agreement in writing and will send it by registered or certified mail to the other party. Franchisor will address notices to Franchisee at the location of the Capriotti Sandwich Shop you are operating or the address at the start of this Agreement until you designate a different address. All notices to the Franchisor shall be addressed to Al-Lomar, Inc., 510 N. Union Street, Wilmington, Delaware 19805.

13

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals the day and year first above written.

WITNESS:

AL-LOMAR, INC.

By: _____ (SEAL)
Lois A. Margolet,
President
Date: _____3-17-03_____

TAYLOR FAMILY HOLDINGS, INC.:

By: _Natalie Delucia Taylor_ (SEAL)
Name:  Natalie Delucia Taylor
Title:   President
Date:   _3-17-03_

By: _____ (SEAL)
Name:  Edward Delucia
Title:   Partner in Capriotti's Sandwich Shop
Date:   _3/17/03_

'14

## FRANCHISE GUARANTY AGREEMENT

**FOR VALUE RECEIVED**, and in consideration for, and as an inducement to Franchisor's entering into the Franchise Agreement of even date herewith (the "Franchise Agreement"), by and between Al-Lomar, Inc. ("Franchisor") and Taylor Family Holdings, Inc., dba Capriotti's ("Franchisee"), the undersigned ("Guarantor") is hereby, on behalf of itself, its successors, assigns, heirs, administrators, and general representatives, as the case may be, covenants and agrees with Franchisor, its legal representatives, successors and assigns as follows:

(a) **THAT**, the undersigned will unconditionally guarantee to the Franchisor the prompt and punctual payment of any and all monies due and owing or other amounts that may be or become due to Franchisor from time to time under the Franchise Agreement and will duly perform all of the covenants contained in the Franchise Agreement to be performed by the Franchisee thereunder and, in addition, will pay all damages that may arise in consequence of a default by Franchisee under the Franchise Agreement and all attorneys' fees and other costs that may be incurred by Franchisor in enforcing Franchisee's covenants and agreements set forth in the Franchise Agreement, or in enforcing the covenants and agreements of the undersigned herein: all without requiring notice from Franchisor of any such default, which such notice the undersigned hereby expressly waives;

(b) **THAT**, the undersigned will unconditionally guarantee to Franchisor payment and satisfaction of any claim which Franchisor may have against Franchisee for damages resulting from a violation of any covenant or condition in

15

the Franchise Agreement, including, but not limited to, the covenant not to compete, unfair competition as defined under the Federal Trademark Act of 1946, as amended, or under applicable state unfair competition laws, arising out of Franchisee's activities during the course of, in connection with, or upon the termination of the Franchise Agreement;

(c) **THAT**, at the option of Franchisor, the undersigned may be joined in any action or proceeding commenced by Franchisor against Franchisee in connection with or based upon the Franchise Agreement or any provision thereof, and that recovery may be had against the undersigned in any such action or proceeding, or in any independent action or proceeding against the undersigned, without any requirement that Franchisor or its respective successors or assigns first assert, prosecute or exhaust any remedy or claim against Franchisee, its successors or assigns; such that the liability of the undersigned hereunder shall be deemed primary;

(d) **THAT**, this Franchise Guaranty Agreement shall be absolute, present and unconditional and shall remain in full force and effect and extend to any renewal, extension, indulgence, modification or amendment of the Franchise Agreement, and as to assignment, or other transfer of Franchisee's interests under the Franchise Agreement, whether or not the undersigned shall have had notice thereof;

(e) **THAT**, the validity of this Franchise Guaranty Agreement and the obligations of the undersigned hereunder shall in no way be terminated, limited, diminished, affected or impaired by reason of any action which Franchisor might

16

take or be forced to take against Franchisee, or by reason of any waiver of failure to enforce any of the rights or remedies reserved to Franchisor in the Franchise Agreement or otherwise;

(f) **THAT**, the obligations of the undersigned, if more than one party, shall be joint and several and shall be fully valid and binding as against each signatory hereto individually whether or not any other party or parties hereto have executed this Franchise Guaranty Agreement;

(g) **THAT**, the undersigned waives notice of any and all defaults under the Franchise Agreement;

(h) **THAT**, in any action or proceeding brought on, under or by virtue of this Franchise Guaranty Agreement, the undersigned shall and does hereby waive trial by jury;

(i) **THAT**, this Franchise Guaranty Agreement shall survive the termination of, expiration or cancellation of the Franchise Agreement;

(j) **THAT**, any failure or election to take action against the undersigned pursuant to this Franchise Guaranty Agreement shall not in any way be deemed as a waiver of any rights of Franchisor hereunder.

The use of the singular herein shall include the plural. Each term used in this Franchise Guaranty Agreement, unless otherwise defined herein, shall have the same meaning as when used in the Franchise Agreement. This Franchise Guaranty Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

17

**IN WITNESS WHEREOF,** the undersigned has caused this Franchise Guaranty Agreement to be executed as of even date with the Franchise Agreement.

WITNESS:

GUARANTOR:

Natalie Delucia Taylor, Individually

Date: 3-17-03

18

STATE OF _____, CITY/COUNTY OF _____, to wit:

    **I HEREBY CERTIFY** that on this _____ day of _____, 20___, before me, the subscriber, a notary public in and of the state and city/county aforesaid, personally appeared _____, who executed the foregoing Franchise Guaranty Agreement.

                                              _____
                                              Notary Public

MY COMMISSION EXPIRES:

19

EXHIBIT "A"

## [DESCRIPTION OF AREA OR RADIUS WITHIN WHICH AL-LOMAR SHALL NOT USE NOR ALLOW ANYONE ELSE TO USE ITS TRADEMARKS, SERVICE MARKS, TRADE SECRETS AND TRADENAME

<u>Radius shall be</u>   2   mi<u>les</u>

**EXHIBIT "C"**

## RESTRICTIVE COVENANT AS TO FRANCHISEE

For a period of three (3) years from the date of expiration or termination of the foregoing attached Franchise Agreement, Prospective Franchisee shall not engage in any business within a radius of three hundred (300) miles from the location of the premises being the subject of the attached Agreement, which business is competitive with the business of Franchisor, directly or indirectly, either as principal, partner, agent, manager, employee, stockholder, director, officer, or in any other related capacity.

The undersigned, in consideration of the mutual promises of the parties, and in order to induce Franchisor to execute the attached Franchise Agreement, hereby voluntarily enter in this Restrictive Covenant.

WITNESS:                                   Taylor Family Holdings, Inc.

By: _Natalie Delucia Taylor_ (SEAL)
Name: Natalie Delucia Taylor
Title: President
Date: _3-17-03_

                                          Taylor Family Holdings, Inc.

By: _____ (SEAL)
Name: Edward Delucia
Title: Partner in Capriotti's Sandwich Shop
Date: _3/17/03_

**EXHIBIT "D"**

## RESTRICTIVE COVENANT AS TO SHAREHOLDERS OF FRANCHISEE

For a period of three (3) years from the date of expiration or termination of the foregoing attached Franchise Agreement, the stockholders of Prospective Franchisee shall not engage in any business within a radius of three hundred (300) miles from the location of the premises being the subject of the attached Agreement, which business is competitive with the business of Franchisor, directly or indirectly, either as principal, partner, agent, manager, employee, stockholder, director, officer, or in any other related capacity.

The undersigned, in consideration of the mutual promises of the parties and in order to induce Franchisor to execute the attached Franchise Agreement, hereby voluntarily enter in this Restrictive Covenant.

WITNESS:                                        Taylor Family Holdings, Inc.

By:   Natalie Delucia Taylor (SEAL)
Name: Natalie Delucia Taylor
Title:  President
Date:   3-17-03

Taylor Family Holdings, Inc.

By:   Edward Delucia (SEAL)
Name: Edward Delucia
Title:  Partner in Capriotti's Sandwich Shop
Date:   3/17/03

**EXHIBIT "E"**

EMPLOYMENT AGREEMENT BETWEEN
<u>Taylor Family Holdings, Inc.</u>
AND

_____

THIS AGREEMENT made this _____ day of _____,
_____, by and between _____, a Nevada Corporation having a principal place of business located at 4835 Ft. Apache, Suite K, Las Vegas, NV 89147, (hereinafter referred to as "*Capriotti's*") and _____, an adult individual who resides at _____(hereinafter referred to as "EMPLOYEE").

W I T N E S E T H :

WHEREAS, *Capriotti's* desires to employ and Employee desires to be employed by *Capriotti's* in the capacity of _____.

NOW, THEREFORE, for and in consideration of the covenants contained herein and with the intent to be legally bound hereby, *Capriotti's* and Employee agree as follows:

1.    TERM

     *Capriotti's* hereby agrees to hire Employee on an "at will basis". *Capriotti's* or Employee may terminate this Agreement at any time, for any reason, or no reason. The obligations of Employee referred to in Paragraphs 5, 6, and 7 below shall continue after termination of this Agreement.

2.    EMPLOYMENT AND DUTIES

     *Capriotti's* hereby employs employee to perform such duties as may be determined and assigned to Employee by the supervisor of *Capriotti's*.

3.    PERFORMANCE

     Employee hereby agrees to devote all of Employee's time and best efforts to the performance of Employee's duties and to the performance of such other duties as are assigned Employee from time to time by the President or superior.

4.    COMPENSATION FOR SERVICES RENDERED BY EMPLOYEE

     *Capriotti's* hereby agrees to compensate Employee on the following terms:

     Rate of Pay:    _____

5.    CONFIDENTIAL AND PROPRIETARY INFORMATION

In order to enable Employee to perform Employee's duties. *Capriotti's* may be required to impart to Employee confidential and proprietary information (hereinafter sometimes referred to as "trade secrets") including, without limitation, all recipes, methods, and processes used in preparing and serving food items served and/or offered for sale by *Capriotti's*, sources of supply, spice, condiments, and preparing the food items served and/or offered for sale by *Capriotti's* customer lists, and sales data. Employee hereby acknowledges that *Capriotti's* trade secrets have been developed by *Capriotti's* through a substantial investment of time, expense and labor and further acknowledge that any use of such trade secrets by Employee and/or anyone acting in concert with or on behalf of Employee, except at *Capriotti's* direction in the course of employment, or written consent otherwise, for the sole benefit of *Capriotti's*, would be wrongful and would result in immediate and irreparable harm to *Capriotti's*. Employee hereby agrees that Employee will not, during the term of this Agreement, or after the termination of this Agreement, use, act upon, disclose, sell or otherwise permit to pass out of Employee's possession, custody or control, any of *Capriotti's* trade secrets.

6.    NON-COMPETITION

During the term of Employee's employment with *Capriotti's* and for a period of three (3) years thereafter:

a.    Employee shall not, directly or indirectly, for Employee, or for or on behalf of any person or entity other than *Capriotti's* in any capacity whatsoever, including, without limitation, that of an owner, operator, manager or employee, be engaged in or associated with any person or entity in the restaurant or food purveying business which produces, serves and/or offers for sale the menu items or those substantially similar thereto provided by *Capriotti's* in the United States.

b.    Employee shall not, directly or indirectly, for Employee, or for or on behalf of any person or entity, in any capacity, including, without limitation, that of owner, operator, manager or employee, engage in competition with the business of *Capriotti's*.

7.    EMPLOYEE INVENTIONS

In the event Employee invents, formulates, develops or modifies any recipe and/or process for preparing food items during the term of Employee's employment with *Capriotti's* pursuant to general request of *Capriotti's* or specific requests by *Capriotti's* to improve, develop, invent, formulate or modify any recipe or process of preparing food items then being use by *Capriotti's* expending the money and materials of *Capriotti's* in such invention, improvement, formulation, development or modification, such invention, formulation, recipe, process or modification and all intellectual property rights pertaining thereto shall be the property of *Capriotti's*. Employee hereby agrees to perform all necessary acts required to vest any such intellectual property rights in and to *Capriotti's*, without additional compensation. Employee further agrees to make and execute any and all documents that may be deemed by *Capriotti's* proper and necessary to transact and/or invest in and to *Capriotti's* the entire right, title and interest in all such intellectual property.

8.    REMEDIES

Employee further agrees that in the event of any breach or threatened breach of the terms of this Agreement, *Capriotti's* shall be authorized and entitled to obtain from any Court of competent jurisdiction, immediate, preliminary and permanent injunctive relief, and equitable

accounting of all profits or benefits arising out of such breach or threatened breach and reasonable attorneys' fees incurred in litigating any action arising out of or relating to such a breach or threatened breach, which rights and remedies shall be cumulative and in addition to any other rights or remedies to which *Capriotti's* may be entitled under the laws of the State of Delaware.

9.    GOVERNING LAW

This Agreement and all rights and duties of *Capriotti's* and Employee hereunder shall be governed by the laws of the State of Delaware.

10.    MODIFICATION

This Agreement may not be modified in any manner except by written agreement of both *Capriotti's* and Employee.

11.    ASSIGNMENT

*Capriotti's* may assign its rights and/or obligations set forth in this Agreement. All covenants and agreements hereunder shall inure to the benefit of and be enforceable by *Capriotti's* successors and assigns.

12.    PRIOR ORAL REPRESENTATIONS

This Agreement shall supersede all prior agreements, representations, warranties and understanding between the parties hereto.

13.    SEVERABILITY

In the event any one or more of the paragraphs or clauses contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not effect any other provision thereof and this Agreement shall be construed as though such invalid, illegal or unenforceable provision had never been contained herein and there shall be deemed substituted such other provision as will most nearly accomplish the intent of the parties to the extent permitted by applicable law.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

Taylor Family Holdings, Inc.

_____     By_____
(SEAL)

_____     _____
WITNESS                              EMPLOYEE'S SIGNATURE

**EXHIBIT "F"**

## COLLATERAL ASSIGNMENT OF LEASE

Assignor and Assignee have entered into a Franchise Agreement dated _____, hereinafter referred to as the "Franchise Agreement". On that same date, this Collateral Assignment of Lease is made and entered into by and between _____ ("Tenant"), hereinafter called "Assignor," and Al-Lomar, Inc., hereinafter called "Assignee".

Assignor has entered into a Lease with _____ as Landlord, dated _____, _____, for certain premises located at _____, hereinafter referred to as the "Lease".

To secure the faithful performance of the terms described in the Franchise Agreement and Lease, Assignor desires to assign its interest in the Lease to Assignee.

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between Assignor and Assignee as follows:

1.    Upon Assignee's election, Assignor hereby assigns its rights, title, and interest in the Lease to Assignee. Assignee may elect to have the Lease assigned to it upon the occurrence of any of the following events:

a.    A default exists after termination of a cure period in the payment of rent due from Assignor to Landlord under the terms of the Lease or in an uncured default remains under any of the terms, covenants, and conditions in the Lease.

b.    Upon termination or expiration of the Franchise Agreement.

c.    If Assignor sells or closes the business being conducted within the demised premises covered by the Lease.

2.    Upon the occurrence of the events set forth in Paragraph 1 of this document, Assignee may elect to have this Agreement become operative by sending written notice, sent certified mail, return-receipt requested, to Assignor and Landlord.

3.    In the event Assignee exercises its right to have the Lease assigned, Assignor shall be fully released and discharged from all liability for future rent and other lease charges and all other future liability under the Lease. However, Assignor and not Assignee shall remain liable for unpaid rent and other lease charges for the period of Assignor's occupancy or any other then existing liability to the Landlord under the Lease.

4.    Assignor agrees that it will not suffer or permit any surrender, termination, amendment, or modification of the Lease without prior written consent of Assignee.

5.      Notwithstanding any other provision of this Agreement, it is expressly understood by the Assignor that this Agreement shall not release him/it from any liability or obligations under the covenants of the Lease.

6.      This instrument shall remain in effect through the full term of the Lease and any renewals, extensions, or amendments of the Lease.

TENANT/ASSIGNOR:                          ASSIGNEE:

[_____]                   AL-LOMAR, INC.

By: _____               By: _____

Title: _____            Title: _____

**EXHIBIT "G"**

## LANDLORD'S CONSENT TO COLLATERAL ASSIGNMENT OF LEASE

_____, as Landlord, hereby consents to the Collateral Assignment of its Lease dated _____, _____ entered into with _____ _____, Tenant/Assignor, to Al-Lomar, Inc., Assignee ("Collateral Assignment").

1.    As set forth in the Collateral Assignment, Landlord consents that under the Collateral Assignment, Assignee may elect to have the Lease assigned to it upon occurrence of any of the following events:

a.    A default exists in the payment of rent after termination of a cure period due from Assignor to Landlord under the terms of the Lease or, if an uncured default, remains under any of the terms, covenants, and conditions in the Lease.

b.    Upon termination or expiration of the Franchise Agreement.

c.    If Assignor sells or closes the business being conducted within the demised premises covered by the Lease.

2.    As set forth in the Collateral Assignment, upon the occurrence of the events set forth in Paragraph 1, Assignee may elect to have the Assignment become operative by sending written notice, sent by certified mail, return-receipt requested, to Assignor and Landlord.

3.    As set forth in the Collateral Assignment, in the event Assignee exercises its right to have the Lease assigned, Assignor shall be fully released and discharged from all liability for future rent and other lease charges and all other future liability under the Lease. However, Assignor and not Assignee shall remain liable for unpaid rent and other lease charges for the period of Assignor's occupancy or any other then existing liability to the Landlord under the Lease.

4.    As set forth in the Collateral Assignment, it is expressly understood by the Assignor that this Assignment shall not release him/it from any liability or obligations under the covenants of the Lease.

5.    As set forth in the Collateral Assignment, the Collateral Assignment shall remain in effect through the full term of the Lease and any renewals, extensions, or amendments of the Lease.

6.    In the event Assignor defaults under the Lease, Landlord hereby agrees to concurrently notify, in writing, both Assignor and Assignee. Upon receipt of a default notice, Assignee shall have at its discretion, the right (but not the obligation) to cure any default under the

Lease, should Assignor fail to do so, within thirty (30) days after the expiration of the period in which Assignor may cure the default.

LANDLORD

[_____]

By: _____

Title: _____

EXHIBIT "H"

[FRANCHISE INFORMATION SHEET]

## INFORMATION CONCERNING SHAREHOLDERS AND OTHER PERSONS

### SHAREHOLDERS

| NAME | ADDRESS | PHONE | STOCK OWNED |
|------|---------|-------|-------------|
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |

### EXECUTIVE OFFICERS

| NAME | ADDRESS | PHONE | STOCK OWNED |
|------|---------|-------|-------------|
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |

### BOARD OF DIRECTORS

| NAME | ADDRESS | PHONE | STOCK OWNED |
|------|---------|-------|-------------|
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |
|      |         |       |             |