## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CAPRIOTTI'S SANDWICH SHOP, INC.,)
)
      Plaintiff, )
)
v. )    Civ. No. 12-28-SLR
)
TAYLOR FAMILY HOLDINGS, INC. )
and NATALIE DELUCIA TAYLOR., )
)
      Defendant. )

Richard L. Horwitz, Esquire, David E. Moore, Esquire and Jonathan A. Choa, Esquire of Potter Anderson & Corroon LLP of Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Michael L. Sturm, Esquire of Wiley Rein LLP.

Brian Lucian Kasprzak, Esquire of Marks, O'Neill, O'Brien & Courtney, P.C. of Wilmington Delaware and John A. Elzufon, Esquire and Andrea C. Rodgers, Esquire of Elzufon Austin Reardon Tarlov & Mondell, P.A. of Wilmington Delaware. Counsel for Defendants.

## MEMORANDUM OPINION

Dated: April 25, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On January 17, 2012, Capriotti's Sandwich Shop ("plaintiff" or Capriotti's), a

Nevada corporation with its principal place of business in Las Vegas, Nevada, filed suit

against Taylor Family Holdings, Inc. ("TFH"), its franchisee, and Natalie Delucia Taylor

("Taylor"), the president and partial owner of TFH, (collectively, "defendants"). (D.I. 1)

On that same day, plaintiff filed for a preliminary injunction. (D.I. 4)  Defendants have

responded to plaintiff's motion for a preliminary injunction; defendants have also filed

motions to dismiss under Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(2)

and 12(b)(3), as well as a motion to transfer. (D.I. 12; 24)  On April 11, 2012, the court

heard oral argument on these motions. (D.I. 37).  For the following reasons, the court

grants in part and denies in part defendants' motion to dismiss or transfer (D.I. 24) and

denies plaintiff's motion for a preliminary injunction (D.I. 4).

## II. BACKGROUND

### A. Capriotti's History and Marks

Plaintiff is the corporate owner (i.e., franchisor) of a national chain of sandwich

shops. (D.I. 1 at ¶¶ 7;11)  The Capriotti's business began in 1986 in Wilmington,

Delaware when Lois and Alan Margolet, a sister and brother team, opened up a

sandwich shop on North Union Street and named it in honor of their grandfather, Phillip

Capriotti. (Id. at ¶ 7; Ex. A)  The goal of the founders was to "capture the hearts of 'real

turkey lovers'" by serving "made-to-order . . . fresh roasted pulled turkey" sandwiches.

(Id. at Ex. A)  The business would succeed and expand and was eventually sold to the

current Nevada-based owners. (Id. at ¶ 2-14)  To date, there are approximately

seventy-five Capriotti's sandwich shops franchised throughout the United States, with Nevada being the largest market and Delaware being the second largest. (*Id.* at ¶ 11) THE BOBBIE, which contains roasted turkey, cranberry sauce and stuffing, would become, and remains, plaintiff's most recognizable sandwich. (*Id.* at at ¶ 7)

Plaintiff is the owner of certain trademarks. These include:

2

| Service Mark | Registration No. | Registration Date |
|---|---|---|
| CAPRIOTTI'S SANDWICH SHOP | 3,530,393 | November 11, 2008 |
| - EST. 1976 – CAPRIOTTI'S SANDWICH SHOP & Design  | 3,571,960 | February 10, 2009 |
| CAPRIOTTI'S & Design  | 3,015,434 | November 15, 2005 |
| THE BOBBIE & Design  | 2,273,912 | August 31, 1999 |
| THE "BOBBIE" | 3,622,413 | May 19, 2009 |

(D.I. 1 at ¶ 8)

### B. The Parties' Franchise Agreement

TFH, and in particular, Taylor, run a Capriotti's franchise at 4825 South Fort

Case 1:12-cv-00028-SLR Document 38 Filed 04/25/12 Page 5 of 22 PageID #: 1106

Apache Road in Las Vegas, Nevada.[1]  (*Id.* at at ¶ 12)  THF's operation of this franchise

is governed by a March 17, 2003 franchise agreement signed by Al-Lomar, Inc. (a

Delaware-based corporation that was the original franchisor of Capriotti's sandwich

shops) and TFH. (*Id*; Ex. D)

Section 5 of the franchisee agreement states, in pertinent part:

5.  **Trademark, Trade Names, and Trade Secrets:**  Franchisee
acknowledges that it is required, to the extent possible, to prevent those
persons or parties associated with or employed by it from unauthorized use
of the Franchsior's Marks and Name . . .

Franchisee therefore covenants and agrees to perform and abide by the
following provisions:

. . .

(c) . . . All advertising and promotion must conform to the standards
and requirements specified by Al-Lomar. Franchisee  must submit to Al-
Lomar . . . for prior written approval samples of all advertising and
promotional plans and materials to be used by Franchisee in the Franchised
Business.

(*Id.* at Ex. D, section 5)[2]  Failure to comply with the terms of the franchise agreement,

including section 5, are grounds for termination of the agreement. (*Id.* at Ex. D, section

10(c))

## C. The Alleged Breach of the Franchise Agreement

---

[1]  TFH was originally comprised of Taylor and her ex-husband, as well as Ed and
Candy Delucia, Taylor's brother and sister-in-law. (D.I. 37 at 201-02)  After Taylor and
her husband divorced, Taylor bought out her ex-husband's share of the business. (*Id.*)
Currently, TFH is comprised of Taylor and her brother and sister-in-law. (*Id.*)  Taylor is
charged with running the Capriotti's sandwich shop while her brother and sister-in-law
operate a pizza restaurant also owned by TFH. (*Id.* at 201-04)

[2]  Sections 5(d-e) and 8(f) impose similar advertising-based restrictions. (D.I. 1
at Ex. D)  For brevity's sake, the court has not included those similarly phrased
conditions.

4

In November of 2011, plaintiff learned that the Crazy Horse III ("Crazy Horse" or "the club"), a Las Vegas-based gentleman's club, was offering a happy hour promotion in which customers could receive a six-inch Capriotti's sandwich and a beer for five dollars. (*Id.* at ¶ 16) A promotional flyer prepared by the club advertised this deal; the flyer featured an exotic dancer along with one of Capriotti's marks (in particular, mark number 3,571,960). (D.I. 37 at Ex. JTX3) The club also advertised the deal on its facebook page and the local ESPN radio affiliate. (*Id.* at 28; 42) The promotion was picked up by, and mentioned in, several Las Vegas-based blogs.[3] (*Id.* at JTX 10; 11; 12). As plaintiff notes, Crazy Horse's advertising and the internet-based publicity "falsely suggested that the promotion was sponsored or authorized by Capriotti's." (D.I. 1 at ¶ 17)

Plaintiff was "alarmed and disturbed" by this "direct[] and improper[] associat[ion of] the Capriotti's Marks with sexually oriented entertainment." (D.I. 5 at 4-5) After an investigation, plaintiff determined that Crazy Horse "had not acted independently and it was Defendants who had, without authorization, 'teamed up' with [Crazy Horse] to offer and promote Capriotti's [sandwiches] . . . in connection with . . . topless dancing." (*Id*; D.I. 1 at ¶ 19) In response to this discovery, on November 15, 2011, plaintiff sent defendants a notice of default. (D.I. 1 at Ex. I) That notice explained that defendants' "sale of food to an adult entertainment business for resale and promotion to their

---

[3] For instance, one blog posted the following: "Hey, you like boobs, don't you? Of course you do. You like sandwiches too, right? Now why not put them together. . . . Apparently Crazy Horse III is teaming up with Capriotti's to offer lap dance enthusiasts six-inch-subs with a beer for five bucks during happy hour from 1 to 7 p.m. daily. . . ." (D.I. 1, Ex. H)

5

customers and their use of the Capriotti's name and trademarks threaten to damage the reputation and goodwill of all existing and future [Capriotti's sandwich shops]." (*Id.*) The letter further provided that defendants had five days in which to cure their defaults; refusal or failure to do so would result in termination of the franchise agreement. (*Id.*) Believing that sufficient curative actions had not occurred, plaintiff sent a notice of termination to defendants on November 28, 2011. (*Id.* at Ex. K)

The Crazy Horse eventually ceased promoting the Capriotti's-based happy hour special. Regardless, plaintiff believes that defendants breached the service agreement and failed to cure and, therefore, plaintiff seeks to terminate defendants' association with Capriotti's. Defendants dispute that a breach occurred, and they continue to operate the franchise as they did before the termination letter.

### D. Subsequent Legal Proceedings

Unable to amicably resolve this dispute,[4] legal actions were filed by the parties in Delaware. On January 17, 2012, plaintiff filed suit in this court. Plaintiff's complaint set forth five counts: 1) a violation of section 32 of the Lanham Act, 15 U.S.C. § 1114; 2) a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); 3) a breach of contract claim against TFH; 4) a breach of guarantee claim against Taylor; and 5) an

---

[4] Following receipt of the termination notice, the parties met in an effort to resolve their dispute. (D.I. 37 at 84-85) At some point thereafter, defendants hired an attorney. Via a December 7, 2011 letter from their attorney to plaintiff's counsel, defendants denied breaching the franchise agreement and, argued alternatively, that cure had occurred. (D.I. 37 at 87-88; JTX 14) This letter prompted the parties' attorneys to send each other a series of letters; those letters acknowledged the applicability of Delaware law and indicated that Delaware was potentially a proper venue for suit. (*Id.* at JTX 14,15, 18) A December 30, 2011 letter from defendants' counsel acknowledged the possibility of being "forced to go on the offensive with the initiation of an adversary proceeding in Delaware Chancery Court." (*Id.* at JTX 18)

6

unjust enrichment claim against both defendants. (D.I. 1) On the same day, plaintiff filed a motion for a preliminary injunction that would prohibit defendants from continuing to operate their franchise. (D.I. 4)

The following day, on January 18, 2012, defendants filed suit in Delaware Chancery Court seeking a temporary restraining order to "(1) prevent [Capriotti's] from terminating or attempting to terminate its Franchise Agreement with [defendants], and (2) enter a Status Quo Order until final resolution of this matter." *Taylor Family Holdings, Inc. v. Capriotti's Sandwich Shop, Inc,.* 7177-VCL (Del. Ch. filed Jan. 18, 2012). This case was stayed by the Vice Chancellor in light of the proceedings pending in this court.

After the motion for a preliminary injunction was filed, the undersigned initiated a telephone conference with the parties. This conference was held on February 14, 2012. (D.I. 29) After the conference, by agreement of the parties, the court issued a March 12, 2011 order that permitted the parties to engage in limited discovery prior to an evidentiary hearing scheduled to be conducted on April 11, 2012. (*Id.*) Defendants made no objection to jurisdiction in their response to the preliminary injunction or during the initial teleconference. However, on February 29, 2011, defendants filed a motion to dismiss or transfer based on jurisdictional concerns. (D.I. 24)

At the April 11, 2012 hearing, the court heard live testimony from Ashley Morris ("Morris"), the chief executive officer of Capriotti's. Morris testified consistent with facts laid out in the complaint (discussed above). He confirmed that the Crazy Horse happy hour special was not sanctioned by plaintiff, nor would it have been given its association with adult entertainment. (*Id.* at 22-26) When asked about his investigation into how

7

the promotion began, Morris stated that he called the Crazy Horse and eventually spoke with Skip Waugh ("Waugh"), a manager at the club who was responsible for coordinating the Capriotti's-based promotion. (Id. at 29-37) According to Morris, Waugh told him that he had approached Taylor about doing the five dollar beer and sub promotion and, given the club's popularity and advertising capabilities, he felt it would be a "win/win" for both companies. (Id. at 36) Originally the thought was that Crazy Horse would buy 40 to 80 sandwiches a day from Taylor's franchise. (Id.) Waugh also told Morris that he thought he had the authority to advertise with a Capriotti's mark based upon Taylor's representations. (Id. 36-37)

Morris further testified that when he confronted Taylor regarding her role in the promotion, she did not deny involvement to the degree that he would have expected her to had she known nothing about it. (Id. at 31-35) According to Morris, Taylor did not unequivocally deny granting Waugh permission to advertise with the Capriotti's name and mark; instead she said something like, "I think I told [Waugh] it wasn't a good idea [to advertise]." (Id. at 33-34) Her hesitant response convinced Morris that Taylor had approved the club's Capriotti's-based promotion. (Id.)

While Waugh did not testify at the court's April 11, 2012 hearing, portions of his deposition testimony were read into the record. When asked to describe how the Capriotti's based promotion came about, Waugh explained that the Crazy Horse was trying to entice more customers into visiting the club during the lunch hour. (Id. at 134-36) One of the club employees suggested using Capriotti's and mentioned that she had a friend (Taylor) who owned a franchise. (Id.) In light of this, Waugh called Taylor

8

and inquired about pricing and sandwich selection. (*Id.* at 137-45) Waugh testified that

he clearly mentioned wanting to advertise the promotion with the Capriotti's name;

specifically, Waugh claimed that Taylor approved the use of the Capriotti's logo on the

promotional flyer so long as it was small. (*Id.* at 142; 167-68)

Waugh also prepared and signed an affidavit which was admitted into evidence.

In that affidavit, Waugh swore to the following:

> 5. In paragraph 20 of her Affidavit, [Taylor] states that "I informed Mr.
> Waugh that neither he nor I could use Capriotti's name in any way without
> going to Capriotti's corporate advertising committee and obtaining prior
> approval. I informed him in no uncertain terms that I did not give him
> permission to advertise Capriotti's name in any way, shape or form." That
> statement is false. [Taylor] did not give me any such warning, in those words
> or in any other. . . . To the contrary, it was my understanding that she fully
> approved of the promotion and she had authority to do so. I would never
> have gone forward with the Capriotti's promotion had [Taylor] given me the
> warning of a type reflected in Paragraph 20 of her affidavit or if I had
> understood at the time that she was not authorized to grant approval.
> Similarly, I am certain that [Taylor] did not warn me that "the process was to
> obtain Capriotti's permission prior to any use of their trade name."
>
> 6. From my first conversation with [Taylor] it was clear that the intent
> was to promote the availability of Capriotti's sandwiches to patrons at the
> Crazy Horse III in connection with the purchase of a beverage.
>
> . . .
>
> 7. In order to advertise the Capriotti's based promotion, I prepared
> the Flyer that is attached as Exhibit A. Contrary to the statement in
> Paragraph 28 of her affidavit that she was unaware of our advertising, I
> specifically discussed the fact that I was preparing this flyer with [Taylor],
> including the fact that I intended to use the "Capriotti's Sandwich Shop"
> name and logo. In response, [Taylor] told me that we could use the name
> and logo on the flyer "as long as it was small."

(*Id.* at Ex. JTX 20)

Taylor also testified at the April 11, 2012 hearing; she recounted a much different

version of events than either Morris or Waugh. According to Taylor, during her first call

with Waugh, no mention of advertising occurred; as she understood it, Waugh wanted to provide food for 40 to 80 people at the club and wanted her to provide an email with price quotes. (*Id.* at 206-209) Taylor acknowledged that advertising came up on her second phone call with Waugh, but she claims that she explicitly told him that she could not authorize advertising because it had to go through corporate; she could, however, sell him sandwiches without any problems. (*Id.* at 209-10) On November 8, 2011, Waugh called Taylor and ordered 10 twelve-inch sandwiches (a smaller number of sandwiches than originally discussed). (*Id.* at 211) Over the next four days, he ordered approximately the same number of sandwiches. (*Id.* at DX 1) Given the small size of the order relative to their initial discussions, Taylor did not think these orders related to a promotion; instead she thought that club employees were eating and/or sampling the food. (*Id.* at 213) Taylor denies ever having been asked for permission to use the Capriotti's name and logo in conjunction with a promotional flyer. (*Id.* at 213-14)

Taylor also testified to her interactions with Morris following his discovery of the Crazy Horse promotion. According to Taylor, she readily admitted selling sandwiches to Crazy Horse, and she did not think that was a problem; she also claims that she explicitly denied giving Waugh permission to advertise. (*Id.* at 222) Cognizant of Morris' concern and his demand that she stop selling to Crazy Horse, Taylor offered to, and did, call Waugh and told him that she could not sell him any more sandwiches. (*Id.* at 223-25) According to Taylor, she said to Waugh, "I just got a phone call from my boss telling me that he heard advertising on ESPN News and Facebook. We're not supposed to advertise. I can't do business with you anymore." (*Id.* at 225) Taylor went

10

on to say: "So when I told [Waugh] that [he] wasn't allowed to advertise, I can't do business with you, I can't sell you any more sandwiches, it was – that was it. It was – it was cured. It was a done deal. I mean I did what I told [Morris] I would do." (*Id.* at 226) In Taylor's mind, her call to Waugh rectified the situation. (*Id.* at 226-29) She left the country on vacation two days later without informing her business partners or any one on her staff of the issue. (Id. at 226-27)

Taylor testified that Morris never referenced that a default letter would be put in the mail and, therefore, she was not expecting one. (*Id.* at 224) While she acknowledged a default letter arriving, Taylor was on vacation when it was signed for, and she never saw it before receiving the notice of termination. (*Id.* at 228-29)

## III. STANDARDS OF REVIEW

### A. Motions to Dismiss or Transfer

Rule 12(b)(2) directs the court to dismiss a case when the court lacks personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. *Traynor v. Liu,* 495 F. Supp. 2d 444, 448 (D. Del. 2007). Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing, with reasonable particularity, that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion

11

"requires resolution of factual issues outside the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984). Specifically, plaintiff must satisfy, by a preponderance of the evidence, two requirements: (1) that "there is a statutory basis for jurisdiction under the forum state's long-arm statute" and (2) that "the exercise of jurisdiction comports with the defendant's right to due process." *L'Athene, Inc. v. EarthSpring LLC*, 570 F. Supp. 2d 588, 590 (D. Del. 2008) (citing *Time Share*, 735 F.2d at 66); *Reach & Assocs. P.C. v. Dencer*, 269 F. Supp. 2d 497, 502 (D. Del. 2003). Delaware state courts interpret Delaware's long-arm statute as "confer[ring] jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480-81 (Del. 1992); *LaNuova D & B S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (D. Del. 1986); *see also Boone v. Oy Partek Ab*, 724 A.2d 1150, 1156-57 (Del. Super. 1997), *aff'd*, 707 A.2d 765 (Del. 1998). However, the jurisdictional analysis "must not be collapsed into a single constitutional inquiry." *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 370 n.3 (D. Del. 2008). Accordingly, personal jurisdiction over a defendant is only proper if it meets the requirements of Delaware's long-arm statute and, separately, comports with due process.

Fed. R. Civ. P. 12(b)(3) provides that a motion to dismiss may be made on the basis of improper venue. Fed. R. Civ. P. 12(b)(3). The purpose of venue, in most instances, "is to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir. 1994). Section 1391(b) of Title 28 of the United States Code, which

governs venue generally, provides that a

> civil action may be brought in (1) a judicial district where any defendant
> resides, if all defendants reside in the same State, (2) a judicial district in
> which a substantial part of the events or omissions giving rise to the claim
> occurred, or a substantial part of the property that is the subject of the action
> is situated; or (3) a judicial district in which any defendant may be found, if
> there is no district in which the action may otherwise be brought.

28 U.S.C. 1391(b).

Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any

other district where the action might have been brought for the convenience of parties

and witnesses and in the interests of justice. Congress intended through § 1404 to

place discretion in the district court to adjudicate motions to transfer according to an

individualized, case-by-case consideration of convenience and the interests of justice.

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Affymetrix, Inc. v. Synteni,*

*Inc.*, 28 F. Supp. 2d 192, 208 (D. Del. 1998).

The burden of establishing the need to transfer rests with the movant "to

establish that the balance of convenience of the parties and witnesses strongly favor

the defendants." *Bergman v. Brainin*, 512 F. Supp. 972, 973 (D. Del. 1981) (citing

*Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)); *Medicis Pharmaceutical*

*Corp. v. Nycomed U.S. Inc.*, Civ. No. 10-419-SLR, 2011 WL 1230276, at *2 (D. Del.

Mar. 31, 2011). "Unless the balance is strongly in favor of a transfer, the plaintiff's

choice of forum should prevail." *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565,

567-68 (D. Del. 2001); *Shutte*, 431 F.2d at 25. The deference afforded plaintiff's choice

of forum will apply as long as a plaintiff has selected the forum for some legitimate

reason. *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 562 (D. Del. 1998).

13

The Third Circuit has indicated that the analysis for transfer is very broad.

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (1995). Although emphasizing that

"there is no definitive formula or list of factors to consider," *id.*, the Third Circuit has

identified potential factors it characterized as either private or public interests. The

private interests include:

> (1) plaintiff's forum preference as manifested in the original choice; (2)
> defendant's preference; (3) whether the claim arose elsewhere; (4)
> the convenience of the parties as indicated by their relative physical
> and financial condition; (5) the convenience of the witnesses but only
> to the extent that the witnesses may actually be unavailable for trial
> in one of the fora; and (6) location of books and records (similarly
> limited to the extent that the files could not be produced in the
> alternative forum).

*Id.* (citations omitted). The public interests include:

> (1) the enforceability of the judgment; (2) practical considerations that
> could make the trial easy, expeditious, or inexpensive; (3) the relative
> administrative difficulty in the two fora resulting from court congestion;
> (4) the local interest in deciding local controversies at home; (5) the
> public policies of the fora; and (6) the familiarity of the trial judge with
> the applicable state law in diversity cases.

*Id.* (citations omitted).

## B. Preliminary Injunction

"The decision to grant or deny . . . injunctive relief is an act of equitable discretion

by the district court." *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

The grant of a preliminary injunction is considered an "extraordinary remedy" that

should be granted only in "limited circumstances." *See Kos Pharm., Inc. v. Andrx*

*Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). The moving party for

injunctive relief must establish: "(1) a likelihood of success on the merits; (2) that it will

14

suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will
not result in even greater harm to the nonmoving party; and (4) that the public interest
favors such relief." *Id.* (citation omitted). The burden lies with the movant to establish
every element in its favor or the grant of a preliminary injunction is inappropriate. *See
P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC*, 428 F.3d
504, 508 (3d Cir. 2005). If either or both of the fundamental requirements – likelihood
of success on the merits and probability of irreparable harm if relief is not granted – are
absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for
Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994).

## IV. DISCUSSION

### A. Jurisdiction

It is well settled that the requirement of personal jurisdiction is intended to protect
a defendant's liberty interests. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de
Guinee*, 456 U.S. 694, 702 (1982). "Because the defense is a personal right, it may be
obviated by consent or otherwise waived." *General Contracting & Trading Co., LLC v.
Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir. 1991) (citing *Ins. Corp.*, 456 U.S. at 703); *Res.
Ventures, Inc. v. Res. Mgmt. Int'l., Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999) (citing,
inter alia, *Insurance Corp.*, 456 U.S. at 702-03) ("Because personal jurisdiction is based
on individual liberty interests protected by the due process clause, unlike subject matter
jurisdiction, it can be waived by a party's express or implied consent to jurisdiction."). A
party may consent[5] to jurisdiction in a number of ways, and the party may do so before

---

[5] As the court in *Interpole* noted, at least for the decision at hand, the terms
consent and waiver can be used interchangeably; accordingly, this court will do the

15

the initiation of the suit, at the time the suit is brought, or after the suit has gotten

underway. *Interpole*, 940 F.2d at 22; 23-24.

In *General Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20 (1st

Cir. 1991), the First Circuit was confronted with an out-of-state corporate defendant's

objection to personal jurisdiction in New Hampshire federal district court, even though,

subsequent to the filing of that suit, the out-of-state corporate defendant filed a second

suit in the same New Hampshire federal district court based on the same set of

operative facts that gave rise to the original suit.[6] After noting that a party can consent

to jurisdiction after the initiation of a suit, the Court concluded that:

> [I]t seems pellucidly clear that, by bringing Suit No. 2, [the out-of-state
> corporate defendant] submitted itself to the district court's jurisdiction in Suit
> No. 1. [The out-of-state corporate defendant] elected to avail itself of the
> benefits of the New Hampshire courts **as a plaintiff**, starting a suit against
> Interpole.   By so doing, we think it is inevitable that [the out-of-state
> corporate defendant] surrendered any jurisdictional objections to claims that
> Interpole wished to assert against it in consequence of the same transaction
> or arising out of the same nucleus of operative facts.

*Id.* at 23 (footnote ommitted).  The Court went on to hold:

> [A] ruling that [the out-of-state corporate defendant] did not submit to the
> court's jurisdiction in Suit No. 1 when it instituted Suit No. 2 would produce
> an unjust asymmetry, allowing a party (here, [the out-of-state corporate
> defendant]) to enjoy the full benefits of access to a state's courts *qua*
> plaintiff, while nonetheless retaining immunity from the courts' authority *qua*
> defendant in respect to claims asserted by the very party it was suing (here,
> Interpole). . . . There is no warrant in either law or logic for accepting such

same in its discussion of defendants' submission to jurisdiction. *Interpole*, 940 F.2d at
23 (viewing distinctions between consent and waiver as "artificial and unnecessary").

[6] More particularly, in May of 1985, General Contracting & Trading sued
Interpole; Interpole in turn filed a third party complaint against the out-of-state corporate
defendant Trastco for indemnity. *Interpole*, 940 F.2d at 21. After a default judgment
was entered against Trastco, Trastco filed suit against Interpole in the same court
alleging fraud and misrepresentation in connection with the same transaction. *Id.*

16

an incongruous result. We, therefore, hold that the [the out-of-state corporate defendant], by initiating its own suit, submitted to the district court's jurisdiction in the prior action.

*Id.* at 23-24.

The *Interpole* Court also found that a traditional jurisdictional analysis was obviated by consent. The court stated: "We bypass [a traditional jurisdictional] analysis . . . [because] our conclusion that [the out-of-state corporate defendant] submitted itself to the court's personal jurisdiction by instituting Suit No. 2 [makes] a conventional long arm analysis irrelevant." *Id.* at 22; *see also Marron v. Whitney Group*, 662 F. Supp. 2d 198, 200 (D. Mass. 2009) ("Consent provides a basis for jurisdiction that exists independently of statutory rules and, therefore, the court may bypass traditional jurisdictional analysis under the long-arm statute where, as here, the defendant has voluntarily submitted himself to the jurisdiction of the forum state."); *Foster Wheeler Energy Corp. v. Metallgesellschaft AG*, No. 91-214, 1993 WL 669447, at *4 (D. Del. Jan. 4, 1993).

While the *Interpole* decision involved two suits filed in the same federal district court, the holding of *Interpole* was more expansive. *See Interpole*, 940 F.2d at 23, n. 4. As the court in *Praetorian Specialty Insurance. Co. v. Auguillard Construction Co., Inc.*, No. 09-1108, 2010 WL 2026655, at *5 (W.D. La. May 20, 2010), explains:

Although the facts underlying *Interpole* involved two suits filed in the same New Hampshire federal district court, the First Circuit held that the federal district court had personal jurisdiction over the out-of-state, corporate defendant because the defendant had elected to avail itself of the benefits of the "New Hampshire **courts** " (plural) as a plaintiff in the second suit which was based on the same facts which gave rise to the first suit. Citing Supreme Court precedent, the First Circuit then noted that in the context of personal jurisdiction it is settled that the concept of a "state's courts" includes

17

all of the federal **and** state courts within a state. In other words, the significance of the out-of-state, corporate defendant's actions in *Interpole* was not limited to the fact that the defendant filed a second lawsuit **in the very federal district court** where the lawsuit in which it was contesting personal jurisdiction was pending. Rather, it was significant that the defendant voluntarily chose to initiate the second lawsuit in **a New Hampshire court**.

Based on this "broader reasoning," other district courts, including *Praetorian Specialty*, have found that "out-of-state defendants who filed lawsuits in a state court waived their right to assert that a federal court in the same forum (i.e., the same state) lacked personal jurisdiction over that defendant for purposes of adjudicating claims which were related to the same facts which gave rise to the state court suit." *Id.* at *5 (citing *Marron v. Whitney Group*, 662 F. Supp. 2d 198 (D. Mass. 2009) and *Larson v. Galliher*, No. 2:06-CV-1471-RCJ-GWF, 2007 WL 81930 (D. Nev. Jan. 5, 2007)).

Consistent with the above authority, the court finds that, by filing suit in the Delaware Court of Chancery, defendants at bar have waived jurisdictional defenses and consented to the jurisdiction of this court. Defendants "can claim no unfairness based upon this court's exercise of jurisdiction over [them], since one who enjoys the full benefits of access to a forum's courts as plaintiff may not simultaneously claim immunity from that forum's authority as defendant." *Marron*, 662 F. Supp. 2d 198, 201.

For the same reasons discussed above, the court also finds that venue is proper. It would be incongruous to hold that an out-of-state defendant has waived his jurisdictional defenses by filing suit in Delaware and then find that venue was improper. *Larson*, 2007 WL 81930, at *4.

### B. Preliminary Injunction

18

A preliminary injunction is an extraordinary remedy that should only be granted in limited circumstances. The plaintiff has the burden of proving an injunction is warranted. The parties and the court agree that the motion for the preliminary injunction, as well as the overall outcome of this case, hinges upon whether or not Taylor breached the franchise agreement by authorizing Crazy Horse's Capriotti's-based promotion (i.e., by failing to prevent, to the extent possible, Crazy Horse's unauthorized use of the Capriotti's name and marks). If Taylor did not breach, plaintiff does not have viable claims under the Lanham Act, nor valid breach of contract, breach of guarantee and unjust enrichment causes of action.

The resolution of plaintiff's request for a preliminary injunction is case dispositive, and rests upon the court's determination as to whether plaintiff is likely to succeed in proving that Taylor, "to the extent possible," protected the Capriotti trademarks and name from the unauthorized use by Crazy Horse. This determination, a subjective one based upon the credibility of those involved, is a difficult one. In this regard, the court is mindful that it conducted the evidentiary hearing without the benefit of having Waugh appear as a witness. Although his declaration and deposition are consistent with plaintiff's version of the facts, it nonetheless is less than ideal when the credibility of a key witness cannot be judged first-hand because the court cannot exert personal jurisdiction over him.

It is regrettable that the court went forward with the hearing, at no little expense to the parties, before considering the late-filed motion to transfer. It was not until Morris and Taylor took the stand that it became apparent how significant Waugh's credibility was to a just determination of this matter for, regardless of Taylor's response to Morris'

19

initial telephone call (the content of which is disputed by Morris and Taylor), if Waugh is to be believed, Taylor in fact was aware of the Crazy Horse promotional ideas and did nothing to prevent the promotion from going forward; i.e., she violated the franchise agreement by not, to the extent possible, protecting Capriotti's trademarks and name from Crazy Horse's unauthorized use.

Because the evidence presented (absent Waugh's declaration and deposition) does not tip the scales of justice toward either party, and because the court is uncomfortable with making what will be the final decision in this case without the benefit of Waugh's live testimony (and the opportunity to judge the credibility of this testimony), the court declines to exercise its equitable discretion in favor of entering the injunction. As a consequence of the fact that the likelihood of plaintiff's success on the merits cannot fairly be judged on the record presented, the harm to defendants (that is, termination of the franchise agreement) and to the public (adjudicating this dispute in a forum without access to the best evidence) weighs against the granting of such extraordinary relief.

## C. Motion to Transfer

As discussed, a court looks to both private and public factors when determining whether to transfer a case, and a case should remain where filed unless the reasons to transfer strongly favor defendant. This is such a case. Although defendants first threatened suit in Delaware and, indeed, filed suit in Delaware, they have filed a motion to transfer the case to Nevada in response to the motion for injunctive relief. Clearly Delaware is a legitimate venue, with both parties choosing Delaware as a forum in the first instance. Nevertheless, as discussed above, the dispute between the parties, as

20

presented to the court at the evidentiary hearing, should not be resolved in Delaware. The dispute arose in Nevada between two Nevada-based businesses and only a Nevada court can exercise personal jurisdiction over critical fact witnesses, particularly Scott Waugh. The *Jumara* factors, both public and private, weigh in favor of transfer, as do the interests of justice.

## V. CONCLUSION

For the reasons discussed above, the court grants in part and denies in part defendants' motion to dismiss or transfer (D.I. 24), and denies plaintiff's motion for a preliminary injunction (D.I. 4), without prejudice to renew. An appropriate order shall issue.

21